UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GERALD D. DA'VAGE,<br><br>   *Plaintiff*,<br><br>  v.<br><br>WCS CONSTRUCTION CO., LLC, *et al.*,<br><br>   *Defendants*. | Civil Action No. 1:22-cv-01418 (CJN) |

**MEMORANDUM OPINION**

Plaintiff Gerald Da'Vage alleges that his former employer, WCS Construction Co., LLC, and certain of its employees discriminated against him on the basis of his race. *See* Compl., ECF No. 1. Defendants move to dismiss. *See* Mem. Supp. Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 6-1. Although the question is a close one, Da'Vage's discrimination and aiding and abetting claims survive dismissal. His other claims do not.

**I.  Background**

Da'Vage is an African American male who was hired on July 2, 2019, by WCS to work as a project superintendent. *See* ECF No. 1 at 5. He was "responsible for the monitoring and oversight of all subcontractor activity" assigned to his area of responsibility. *Id*. Da'Vage worked for WCS until his termination on April 29, 2021. *Id*.

Da'Vage first started working for WCS at one of its jobsites. *See* ECF No. 1 at 5. In March 2020, both he and Eric Murrey, a white project superintendent, sent emails expressing concerns about "WCS's Covid-19 jobsite safety protocol." *Id*. at 8. Da'Vage sent his email to the D.C. Mayor's Office and the District of Columbia's Department of Health and Human Services; Murrey

emailed WCS's upper management. *Id*. On March 30, 2020, two WCS senior project managers, Kevin Cunningham and Jae Parks, summoned Da'Vage to the senior management construction trailer. *Id*. at 9. Cunningham asked Da'Vage who had received his emails regarding COVID-19 conditions at the job site. *Id*. Da'Vage responded, "Kevin, I'm not the only superintendent that sent out emails and I shouldn't be the only superintendent asked this question." *Id*. Parks responded, "[Da'Vage,] you sent an email to the f---ing Mayor's Office." *Id*. After that meeting, Da'Vage observed Scott Vossler (WCS's President), Chris Shaw (WCS's Vice President), and Dave Jones (WCS's Vice President of Operations), enter the senior management construction trailer. *Id*.

The next day, Jones visited Da'Vage's jobsite with Cunningham. *See* ECF No. 1 at 9. Da'Vage alleges that he was "threatened twice by . . . Jones with termination if [his] oversight and quality of subcontractor work did not improve immediately." *Id*. The next day, Da'Vage alleges, he was threatened again by Jones, who asked, "[D]o you know what a poor performance evaluation could result in?" *Id*. According to Da'Vage, no other project superintendent had their work areas reviewed during Jones's and Cunningham's two site visits. *Id*.

Two days later, Cunningham told Da'Vage and a white co-worker that, "Jones wanted to fire [Plaintiff] for sending email to mayors office [*sic*], but [Cunningham] would not agree with . . . Jones." *See* ECF No. 1 at 10. Another two days later, Cunningham gave Da'Vage a performance letter that stated: "[Da'Vage] pushed the units behind John [Blossom] well. I understand there were setbacks on countertops, cabinet install, DES rough-in, shelf bracket issues—I know the setbacks you had in following an orderly schedule/sequence of the work—I don't forget all, the misc. problems that jacked up the sequence of the finishes. Hopefully no one

else has amnesia—we will discuss further, but this is your notice to improve and finish strong." *Id*.

Later that summer, Cunningham forwarded an email from WCS's human relations department acknowledging Da'Vage's one-year anniversary, with the additional message "HAPPY ANNIVERSARY! You made a year without getting fired by . . . [Parks]." *See* ECF No. 1-1 at 5. Cunningham went on to say, "Keep pushing you are doing fine. I got your back." *Id*.

On December 14, 2020, Da'Vage was transferred to a new jobsite. *See* ECF No. 1 at 11. Da'Vage alleges that Cunningham stated to him: "You should go to HR . . . oh, you can't go to HR because you shot yourself in the foot with that COVID email to the mayor's office . . . that email's a part of your file, buddy." *Id*.

Da'Vage encountered various problems at this new jobsite. *Id*. at 10–11. In general, work did not progress as well as it might; Da'Vage alleges that much (though not all) of the fault rested with Marty Shaffer, a white project superintendent whom others had joked about not wanting to work with. As Da'Vage puts it, he was given a "large number of unfinished items" to complete at this new jobsite which affected "progress scheduling and sequence of material installation." *Id*. Shaffer also asked Da'Vage whether it was true that he had emailed the D.C. Mayor's Office to complain about WCS's COVID-19 approach. *Id*. at 11.

In March 2021, Jones, Cunningham, and Parks visited that jobsite "to gather information from WCS's project management staff to determine how to get [the] project back on schedule." *See* ECF No. 1 at 13. By then Cunningham had been promoted to General Superintendent and Parks had been promoted to Project Executive. *Id*. This meeting did not go well. As particularly relevant here, Jones stated to Da'Vage that he "was always angry and often pissed-off [*sic*] subcontractors." *See* ECF No. 1 at 13. Cunningham defended Da'Vage, stating, "I've worked

3

with [Da'Vage] for two-years [sic] . . . never heard anyone say that [he] was angry or pissing off the subcontractors." *Id*. at 14.

A few days later, Da'Vage alleges, Cunningham disclosed to Da'Vage that, "[Y]our co-workers and project management staff has painted you as the angry blackman and . . . Jones believes them; [you] are in . . . Jones['s] and . . . Parks['] crosshairs." *Id*. When Da'Vage replied that it was unfair that he was being targeted when Shaffer "refused to obey direct instructions from the vice president of operations," Cunningham replied, "[Da'Vage,] just do your job, these guys have a lot of history." *Id*.

On April 29, 2021, Da'Vage was fired by Jones and replaced by Jones's son-in-law, John Pozzeil. *See* ECF No. 1 at 15. On April 11, 2022, Da'Vage received a Right to Sue letter from the EEOC. *See* ECF No. 1-1 at 1. Da'Vage then filed suit against WCS, Cunningham and Jones in this Court on May 20, 2022, asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), Section 1981, 42 U.S.C. § 1981, and the DCHRA, D.C. Code § 2-1402.11. Defendants move to dismiss on various grounds. ECF No. 6 at 1.

## II.     Analysis

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e–2(a)(1). Section 1981, in turn, prohibits private employers from intentionally discriminating on the basis of race with respect to the "benefits, privileges, terms, and conditions" of employment. 42 U.S.C. § 1981; *see Runyon v. McCrary*, 427 U.S. 160, 170 (1976). Whereas Section 1981 focuses on intentional discrimination on the basis of race, Title VII addresses a broader set of protected classes and sweeps in facially neutral policies that have a discriminatory impact. And the DCHRA makes it unlawful for employers, on the basis of race or any other protected characteristic, to "fail or refuse

to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his or her compensation, terms, conditions, or privileges of employment." *Id*. § 2-1402.11(a)(1)(A).

Although the statutes differ, courts employ the same framework in assessing claims under them. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *see also Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010); *see also Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (holding that *McDonnell-Douglas* applies to both DCHRA and Section 1981 claims). A plaintiff can allege employment discrimination in two ways: through direct evidence of discriminatory intent or indirect evidence. Direct evidence of discriminatory intent can be demonstrated through statements that themselves show racial bias in the employment decision. *Vatel v. Alliance of Auto. Manufacturers*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Indirect evidence of discrimination can be demonstrated through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell-Douglas* framework, a plaintiff must first plead a prima facie case of employment discrimination by alleging: (1) he is a member of a protected class and (2) the adverse employment action gives rise to an inference of discrimination. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). When a plaintiff has done so, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its action." *Id*. (quoting *Walker*, 798 F.3d at 1091). And if the employer is able to articulate such a reason, the burden shifts back to the plaintiff to show that the employer's stated reasons are pretextual. *Walker*, 798 F.3d at 1091–92.

Da'Vage relies primarily on indirect evidence, so we begin with Da'Vage's prima facie case. "To state a prima facie case, a plaintiff must allege [he] is part of a protected class . . ., [he]

suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) "This standard is relatively easy to clear when, as here, an employer proffers a legitimate, non-discriminatory reason for the challenged action," *see Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493—as WCS has done here.  In any event, there is no dispute that Da'Vage, as a black male, is a member of a protected class and also that he suffered a cognizable adverse employment action—his termination.  The Court therefore assumes that he has stated a prima facie case.

The burden then shifts to WCS to identify "the legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Walker*, 798 F.3d at 1092.  WCS argues that it terminated Da'Vage because of "poor performance," pointing to various claimed problems with Da'Vage's work .  Def.'s Mot. to Dismiss, ECF No. 6-1 at 9.  WCS insists that Da'Vage had been on notice of his performance issues since at least March 2, 2021, and that emails thereafter demonstrate that those issues were unresolved.  *Id*.

Poor performance is, of course, a legitimate, non-discriminatory reason for terminating an employee.  *See Giles v. Trans. Emp. Fed. Cred. Un.*, 794 F.3d 1, 6 (D.C. Cir. 2015).  The burden therefore shifts back to Da'Vage to plead facts from which a reasonable trier of fact could conclude that WCS's proffered reason for his termination—that is, his poor performance—was pretextual.

Pretext can be demonstrated in various ways, including by showing that similar employees of a different race were treated more favorably than the plaintiff, despite similar conduct.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296–97 (D.C. Cir. 2015) ("Evidence suggesting that the employer treated similarly situated persons who were not the same race as the plaintiff more favorably than it treated the plaintiff can . . . be probative of discrimination.").  To show that one employee is "similarly situated to another employee, [the employee] must

demonstrate . . . that all of the relevant aspects of [his] employment situation were nearly identical to those of the other employee." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (quotation omitted). Relevant factors include similarities of jobs and job duties, similarities of offenses, and whether the employee was disciplined by the same supervisor. *Burley*, 801 F.3d at 301. Notably, whether another employee is "similarly situated" is usually a question of fact for the jury. *Banks v. Perdue*, 298 F. Supp. 3d 94, 104 (D.D.C 2018) (citing *Wheeler*, 812 F.3d at 1116).

Da'Vage argues that there were at least six "WCS white project superintendents that were similarly situated" who nonetheless "received favorable treatment and kept their jobs after receiving WCS performance write-ups." Compl., ECF No. 1 at 21. All six, he alleges, had "similar job titles and job duties . . . similar supervision, similar evaluation system[s] and similar disciplinary systems." Pl.'s Opp. to Def.'s Mot. to Dismiss, ECF No. 9 at 2. The Court need not assess all six employees if at least one is sufficient to infer pretext. *See Wheeler*, 812 F.3d at 1116.

The Court concludes that Da'Vage has plausibly alleged the existence of at least two comparators. Start with an unnamed white project superintendent. *See* Compl., ECF No. 1 at 13. Da'Vage alleges that that supervisor was responsible for larger mistakes than Da'Vage but was not fired. To be sure, Da'Vage does not clearly allege whether that superintendent failed to correct subsequent performance issues or that Jones, Da'Vage's supervisor, was responsible for the claimed comparator. But drawing all reasonable inferences in Da'Vage's favor, it is at least plausible that the white superintendent is similarly situated enough to Da'Vage to draw an inference of pretext.

So too with Shaffer. Da'Vage alleges that Shaffer also had performance issues, but refused to address them and was even insubordinate at the March 8, 2021 meeting. To be sure, Shaffer

7

was also terminated on August 2, 2021, a little over three months after Da'Vage was fired. *See* ECF No. 1-1 at 9. But it is at least possible (at the pleading stage) that Shaffer's later firing was related to his insubordination and not his lackluster performance—that is, it is at least plausible (again, at the pleading stage) that when WCS was presented with two employees with lackluster performance, it fired the black employee despite the white employee having both poor work product and insubordination issues. *See* Compl., ECF No. 1 at 14.

Even if that were not enough, additional allegations push Da'Vage's claim of pretext into the realm of plausibility. Recall that Cunningham told Da'Vage that his "co-workers and project management staff" had painted him as "the angry blackman" and that his supervisor, Jones, "believes them." Compl., ECF No. 1 at 14. Da'Vage does not allege that Cunningham was reporting a statement made by Jones, but he does allege that "the slur [came] from co-workers, project managers, project engineer staff and the President of Operations" and that the "Project Executive [David Jones] believe[d] what's been said." Pl.'s Opp. to Def.'s Mot. to Dismiss, ECF No. 9 at 6. These comments, coupled with the comparators discussed above, nudge Da'Vage's pretext allegations just over the line.[1]

---

[1] On the other hand, Da'Vage alleges that a "noose hanging incident" constitutes indirect evidence of WCS's discriminatory intent. *See* ECF No. 1 at 23. The Court disagrees. On June 26, 2020, WCS Superintendents were informed of a noose sighting at the 150 I Street project. ECF No. 1-1 at 8. In response, WCS "immediately conducted an investigation and found the person responsible." *Id*. at 8–9. This person was not a WCS employee but rather worked for a subcontractor. *Id*. WCS held a luncheon to discuss their zero-tolerance harassment policy. *Id*. at 9. Da'Vage alleges that WCS "looked the other way" as part of its "systemic practice of discrimination." *See* ECF No. 1 at 23. But this conclusion is not supported by Da'Vage's own account of the incident. By Da'Vage's own allegation, WCS responded promptly to the incident, which was conducted by one of its subcontractors. The Court does not believe this incident provides evidence of discriminatory intent or pretext.

8

As for Da'Vage's claim for "aiding and abetting" against Cunningham, Compl., ECF No. 1 at 4, under the DCHRA, it is "an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of [the DCHRA] or to attempt to do so." D.C. Code § 2-1402.62. Da'Vage adequately alleges that Cunningham was involved in the termination process, Compl., ECF No. 1 at 29–30, and since Da'Vage adequately alleges a violation of the DCHRA by WCS, his aiding and abetting claim against Cunningham also survives. As for Jones, Da'Vage alleges that he "was fully responsible for the disparate treatment [Da'Vage] received," Compl., ECF No. 1 at 16, which is also sufficient at this stage.

As for Defendants' arguments directed at Da'Vage's other claims, however, the Court finds they are well-founded. In particular, the Court concludes that Da'Vage cannot state a plausible claim that he was retaliated against by WCS for protected activity.[2] To state a cognizable claim of retaliation under Title VII, a plaintiff must allege that: (1) he engaged in protected activity under Title VII; (2) he suffered an adverse employment action from her employer; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Iyoha v. Arch. of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). First, Da'Vage's complaint does not allege that he engaged in protected activity such as registering a complaint with the EEOC, complaining about discrimination to his colleagues, or assisting an investigation into allegations of discrimination at

---

[2] Da'Vage makes a passing comment that "Cunningham's inaction aided and abetted the managerial harassment that [he] had to endure on a daily basis to keep employment." *See* Compl., ECF No. 1 at 17. But Da'Vage does not make an explicit claim that he was harassed, nor has he pleaded sufficient facts to give rise to an inference that he is making a harassment claim. The Court therefore does not address workplace harassment under the anti-discrimination laws.

WCS. *See Arias v. Marriott Int'l, Inc.*, 217 F. Supp. 3d 189, 196 (D.D.C. 2016) ("Protected activity includes having made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing on the basis of discrimination under these statutes.") (internal quotations omitted). At best, he alleges that he was retaliated against by Jones, who "threatened" him with "termination if [his] oversight and quality of subcontractor work did not improve immediately." *See* Compl. ECF No. 1 at 9. This threat was allegedly made in retaliation for Da'Vage's reporting of WCS's COVID-19 protocols to the D.C. Mayor's Office. *Id*. Jones also sent Da'Vage and not other employees a performance letter, *id*. at 10, and Da'Vage was summoned to the "senior management construction trailer" and reprimanded. *Id*. at 31. But even if the Court were to accept that these were adverse employment actions, Da'Vage has not established that reporting COVID-19 protocols to the Mayor's Office is protected activity under the anti-discrimination statutes. Reporting on COVID-19 is not a "protected characteristic" under Title VII, Section 1981, or the DCHRA because it does not involve discrimination based on race, color, religion, sex, or any other protected characteristic. *See Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997).[3]

## Conclusion

For the forgoing reasons, the Court grants in part and denies in part Defendants' Motion. An Order will issue contemporaneously with this Opinion.

DATE: March 27, 2024

CARL J. NICHOLS
United States District Judge

---

[3] As for the other actions that Da'Vage alleges he suffered in retaliation for his COVID-19 email, none of those actions were sufficiently adverse to qualify as retaliatory under the anti-discrimination statutes.