UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GERALD D. DA'VAGE,

    *Plaintiff*,

v.

WCS CONSTRUCTION, LLC, *et al.*,

    *Defendants*.

Civil Action No. 1:22-cv-01418 (CJN)

**MEMORANDUM OPINION**

Plaintiff Gerald Da'Vage claims that his former employer, WCS Construction, LLC, discriminated against him because of his race. After the Court partially denied WCS's motion to dismiss and the Parties completed discovery, WCS moved for summary judgment. For the reasons given below, the Court grants the motion.

**I.  Background**

Da'Vage, who is African American, was hired in July 2019 by WCS as a project superintendent. ECF No. 63-2 (WCS SOF) ¶ 5.[1] He worked for WCS until his termination in April 2021. *Id.* ¶ 59. His direct supervisor was Kevin Cunningham and his second-line supervisor was David Jones. *Id.* ¶¶ 7–8. Da'Vage was "responsible for the monitoring and oversight of all subcontractor activity" assigned to his area of responsibility. *Id.* ¶ 10. His first assignment was to a project at 150 I Street S.E., where the supervising project manager was Jae Park. *Id.* ¶ 6, 9.

---

[1] The Court relies on the undisputed assertions of fact made by WCS. *Compare with* ECF No. 70 at 33–38 (Plaintiff's Statement of Undisputed Material Facts); *see also* Fed. R. Civ. P. 56(e) (courts can "consider [a] fact undisputed for purposes of the motion" for summary judgment where "a party . . . fails to properly address another party's assertion of fact [. . .]").

1

WCS documented concerns regarding Da'Vage's performance early in his tenure. In August 2019, around one month after Da'Vage was hired, Cunningham and Park raised concerns regarding his failure to "walk the job," take notes, and solve problems. *Id.* ¶ 15. On April 1, 2020, Jones observed numerous deficiencies at the I Street site, which he brought to Da'Vage's attention. *Id.* ¶ 22. A few days later, Cunningham emailed Da'Vage identifying specific issues with site cleanliness, organization, and sub-contractor management. *Id.* ¶ 23. Jones received additional complaints about Da'Vage's performance in July 2020. *Id.* ¶ 31. The next month, Park emailed Da'Vage and Cunningham about his concerns with how Da'Vage was managing the site. *Id.* ¶ 32.

In December 2020, as the I Street project neared completion, WCS transferred Da'Vage to a project known as "The Strand." *Id.* ¶ 33. Several other superintendents were transferred to different sites upon substantial completion of the I Street project as well. *Id.* ¶ 34. Da'Vage's supervisor at The Strand was senior superintendent Martin Shaffer. *Id.* ¶ 36.

In February 2021, both Park and the project manager at The Strand emailed Jones about their concerns with Da'Vage's performance. *Id.* ¶ 38. That same month, Cunningham noticed that Da'Vage was inconsistently completing his daily reports in their project management software and sent Da'Vage reminders to perform his weekly safety inspections. *Id.* ¶ 39. Jones memorialized these performance concerns and then conveyed to Da'Vage several of the concerns Jones had with Da'Vage's performance. *Id.* ¶ 41. Da'Vage committed to improving but failed an inspection days later. *Id.* ¶¶ 43–44.

A few weeks later, Cunningham emailed Da'Vage about his failure to obtain prior approval to hang drywall. *Id.* ¶ 46. Cunningham also met with Da'Vage to express concerns raised by co-workers and sub-contractors at The Strand about Da'Vage's performance. *Id.* ¶ 48. Cunningham emailed Da'Vage about these concerns on March 15; he also offered coaching and recommended

that Da'Vage change his communication style and focus on doing his job. *Id.* ¶¶ 50–51. Da'Vage alleges that around this time, Cunningham warned Da'Vage that his "co-workers and project management staff ha[d] painted [him] as the angry black man," that "Jones believes them," and that Da'Vage was "in Jones and Parks['] crosshairs." ECF No. 70 (Da'Vage Statement of Facts) ¶ 38. Cunningham denies making that statement. ECF No. 63-7 (Cunningham Declaration) ¶ 22.

In April 2021, Cunningham and Jones learned that Da'Vage was "directing time and material work without [the project manager's] authorization," WSC SOF ¶ 58, "which put the Company at risk because he authorized work that was often already contracted to other parties." Cunningham Declaration ¶ 36. On April 26, Jones contacted Ian Kessler, then Vice President of Human Resources, for guidance regarding terminating Da'Vage's employment. WCS SOF ¶ 60. Da'Vage was fired two days later. *Id.* ¶ 61.

Almost a year later, Da'Vage received a Right to Sue letter from the EEOC. *See* ECF No. 1-1 at 1. Da'Vage thereafter sued WCS, Cunningham, and Jones, asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), Section 1981, 42 U.S.C. § 1981, and the D.C. Human Rights Act, D.C. Code § 2-1402.11. WCS moved to dismiss on various grounds, ECF No. 6, which the Court granted in part and denied in part. Specifically, the Court found that although Da'Vage's discrimination and aiding and abetting claims survived, his other claims did not. *See* ECF No. 14. After discovery closed, WCS moved for summary judgment. ECF No. 63 (Mot.).

## II.     Legal Standard

Summary judgment is appropriate only when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment must cite to materials in the record or must show that the materials cited by the other party "do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support that fact." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex Corp.*, 477 U.S. at 322. A fact is "material" if it has the potential to affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252, and cannot rely on "mere allegations or denials," *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

### III. Analysis

Title VII, Section 1981, and the DCHRA all prohibit employment discrimination on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981; D.C. Code § 2-1402.11(a)(1). The burden of proof under these laws varies slightly. To prevail under Section 1981, a plaintiff must prove that, but for his race, he would not have suffered the loss of a legally protected right. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Under Title VII and the DCHRA, by contrast, a plaintiff need only show that his race is a *motivating* factor in the decision. 42 U.S.C. § 2000e–2(m); *Mawakana v. Bd. of Trs. of Univ. of the D.C.*, 926 F.3d 859, 866 (D.C. Cir. 2019); *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008). Here, because Da'Vage cannot meet even the lower Title VII and DCHRA standard, WCS is entitled to summary judgment on each of Da'Vage's discrimination claims. And because there can be no aiding and abetting liability where there is no primary violation, WCS is entitled to summary judgment on that claim as well.

#### A. Race Discrimination

"[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). "[W]here an

4

employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not . . . decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). At that point, the relevant question is "whether [the plaintiff] produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against" the plaintiff on an impermissible basis. *Id.* at 495. Evidence of pretext may include an employer's "better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).[2]

Da'Vage suffered an adverse action: his firing. WCS has proffered a legitimate, non-discriminatory reason for firing him: his poor performance. The only question is whether there is sufficient evidence in the record from which a reasonable jury could conclude that WCS fired Da'Vage for discriminatory reasons. Da'Vage invokes comparator evidence, an alleged discriminatory remark, and purported procedural irregularities. The Court evaluates each in turn.

1. **Comparator Evidence**

Da'Vage "seeks to discredit" WCS's justification by "showing that white superintendents"—specifically John Blossom, Tom Facchina, Jeff VanHaaren, and Martin Shaffer—"were not disciplined as severely for similar conduct." ECF No. 70 (Response) at 6. To

---

[2] The same framework applies to both Title VII and DCHRA discrimination claims. *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010).

establish pretext using comparators, Da'Vage must demonstrate that he and the alleged comparators were "similarly situated" in all relevant respects and were treated differently. *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015); *see also Diggs v. Potter*, 700 F. Supp. 2d 20, 50–51 (D.D.C. 2010) (employees are similarly situated only where a plaintiff demonstrates that "all of the relevant aspects of [his] employment situation were 'nearly identical' to those of [his comparables]") (quoting *Bolden v. Winter*, 602 F. Supp. 2d 130, 140 (D.D.C. 2009)). Da'Vage cannot make that showing.

*Jeff VanHaaren*. Da'Vage first points to VanHaaren, a white superintendent employed by WCS for more than four years between March 2016 and November 2020. WCS SOF ¶ 75. In a July 2019 meeting, VanHaaren told a colleague, "sometimes I'd like to stab you in the neck with a pen." Response at 7; ECF No. 70-1 at 7. Presumably because VanHaaren was not fired after that outburst, Da'Vage argues that "VanHaaren received favorable treatment" compared to himself, and that this raises "a genuine issue of material fact regarding [Da'Vage's] termination." Response at 7. But Da'Vage and VanHaaren are not "similarly situated." *Burley*, 801 F.3d at 301. To start, VanHaaren's misconduct was behavioral, whereas Da'Vage's termination resulted from failures that directly affected the construction schedule. *See, e.g.*, WCS SOF ¶ 23 ("On April 4, 2020, Mr. Cunningham emailed Plaintiff to identify concerns with the status of the 150 I Street project. . . . This included issues with the condition of the job, clean-up and sub-contractors, as well as instructions to become more organized and to keep a unit matrix to ensure that loose ends are tied up, so the job is completed in the proper sequence.").

VanHaaren's conduct also did not cause the same level of concern as did Da'Vage's. The colleague who reported VanHaaren's comment also reported that he "did not believe it to be a

6

serious threat so much as a grossly inappropriate expression of frustration," and that he "ha[d] no qualms about continuing to work with" VanHaaren.  ECF No. 70-1 at 7–8.

On the other hand, although Da'Vage does not emphasize it in his brief, some record evidence does suggest that VanHaaren had performance problems; an email dated October 8, 2020, conveys that he was placed on "Decision-Making Leave . . . because of Performance during close out."  *See* ECF No. 70-1 at 18.  But VanHaaren was told "either to solve [his] performance problems . . . or to resign," *id.* at 48, and he did resign one month later, WCS SOF ¶ 75.  Like Da'Vage, then, VanHaaren's employment with WCS ended as the result of his poor performance.  In other words, VanHaaren did not remain employed by WCS notwithstanding his own performance failures.

*John Blossom and Tom Facchina*.  Da'Vage also points to Blossom, a white superintendent employed by WCS for almost ten years.  WCS SOF ¶ 70.  Da'Vage notes that in July 2020, Cunningham sent Blossom home because he "ignored [Cunningham's] directions," "interjected [himself] in another superintendent's area of responsibility," "argued with [Cunningham] about the situation," and "started to lecture another superintendent about how he should conduct an investigation."  Response at 8; ECF No. 70-1 at 16.  Da'Vage contends that while Blossom was merely "sent home to cool-down and instructed to return to work the next day," Da'Vage was terminated for failing an inspection; thus, "favoritism was shown" to a white employee but not Da'Vage.  Response at 9.  But WCS *did* terminate Blossom, in his case "for continued low performance following multiple coaching conversations regarding his lack of urgency, follow up, and communication pertaining to scheduling."  WCS SOF ¶ 70.  And WCS put both employees on notice before it terminated them; Da'Vage acknowledges that he was on notice of WCS's

7

performance concerns from early July 2019 through his termination in late April 2021. *Id.* ¶¶ 5, 59–61.

WCS also terminated Facchina, a white superintendent employed by WCS for almost sixteen years—in his case, for "poor performance, serious site/project safety issues, poor management of sediment and erosion control, and not meeting the roles and responsibility requirements as a superintendent." WCS SOF ¶ 71. Neither Blossom nor Facchina, then, provides evidence of "differential treatment [that] could lead a reasonable jury to find that [WCS] acted with a racially discriminatory motive." *Burley*, 801 F.3d at 300.

*Martin Shaffer.*   Finally, Da'Vage points to Shaffer, a white senior superintendent employed by WCS between January 2014 and August 2021. WCS SOF ¶ 74; Response at 11. But Shaffer is not a proper comparator because he held a senior position; indeed, he was Da'Vage's supervisor at The Strand. WCS SOF ¶ 74. Definitionally, then, he and Da'Vage were not "similarly situated." *Burley*, 801 F.3d at 301. Shaffer was also terminated by WCS. Although Da'Vage characterizes the separation as a resignation, Response at 11, the record reflects that Shaffer was terminated because he was "[n]ot willing to receive constructive performance feedback from Jae Park and Kevin Cunningham regarding Roles and Responsibilities." ECF No. 63-6 at 24; WCS SOF ¶ 74 ("Mr. Shaffer was terminated for performance reasons, including his unwillingness to receive constructive performance feedback.").

In sum, because each of Da'Vage's proffered comparators were either not similarly situated or did not suffer treatment meaningfully different than Da'Vage himself, the comparator evidence is insufficient to allow "a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against" Da'Vage on an impermissible basis. *Brady*, 520 F.3d at 495.

## 2. Alleged Discriminatory Remark

Da'Vage next attempts to show pretext by invoking "other relevant evidence that a jury could reasonably conclude evinces an illicit motive," *Walker*, 798 F.3d at 1092, namely, Cunningham's alleged warning that Da'Vage's "co-workers and project management staff ha[d] painted [him] as the angry black man." Response at 11. Da'Vage contends that "the nexus between the statement and [WCS's] decision to terminate employment is clear," tying Cunningham's remark to the performance issues management had with Da'Vage, such as his perceived lack of "tactfulness when it comes to speaking with the sub[contractors]." *Id.* at 12.

But Cunningham "categorically den[ies] making this statement," Cunningham Declaration ¶ 22, and "conclusory, self-serving statements by a plaintiff do not create a genuine dispute of material fact for purposes of summary judgment." *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 74 (D.D.C. 2015), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015). "This is especially true when these statements are unsubstantiated by any non-self-serving evidence and, in fact, are rendered unreasonable given other undisputed evidence in the record," *id.*—which appears to be the case here given the circumstances of Da'Vage's hiring and firing. After all, David Jones "was one of the individuals involved in the decision to hire" Da'Vage, *see* ECF No. 63-5 at 2, and Jones also "was involved in the decision to terminate [him]." *Id.* at 6. So Da'Vage must overcome the strong inference against discrimination where the person who hired the plaintiff is the same person who fired him. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). In other words, Da'Vage must offer a reason to think that Jones would hire Da'Vage knowing his race only to develop a racial animus shortly thereafter that motivated Da'Vage's termination. Da'Vage does not offer any evidence that would allow a reasonable jury to reach that conclusion.[3]

---

[3] Jones was not solely responsible for hiring and firing Da'Vage, but he does not need to be for the same actor inference to apply. *See, e.g.*, *Hicklin v. McDonald*, 235 F. Supp. 3d 242, 248 (D.D.C.

9

### 3. Deviation from Established Procedures and Inconsistent Explanations

Finally, Da'Vage contends that WCS "deviat[ed] from established procedures or criteria" and provided "inconsistent or dishonest explanations" for its decision to terminate him. *Walker*, 798 F.3d at 1092; *see* Response at 15–22; 24–26. Da'Vage has not established a genuine dispute of material fact on either point.

*Deviation from Established Procedures*. Da'Vage argues that "[t]he absence of a formal system or procedure for employee evaluations can be a significant factor in establishing pretext," and that in his case, "there was a departure from company practice" that could allow a jury to find his employer's explanation "unworthy of credence." Response at 18–19. Specifically, he notes that while VanHaaren received an "Employee Assistance Plan" from management staff, Da'Vage did not receive similar documentation in the lead-up to his own termination. Response at 19–21. But Da'Vage does not (and cannot) dispute that he *was* given feedback on his performance, albeit not in the precise format that VanHaaren received. In August 2019, Cunningham raised concerns about Da'Vage's performance, including specific feedback that he should walk the job more often, take notes, and solve problems. WOC SOF ¶ 15. Park raised concerns with Da'Vage about his performance as well. *Id.* ¶ 16. In March 2020, Jones told Da'Vage that he must improve after observing multiple problems at the I Street project. *Id.* ¶ 22. A few months later, Park again emailed Da'Vage about his concerns with how Da'Vage managed specific tasks. *Id.* ¶ 32. In March 2021, Jones conveyed to Da'Vage "at least six concerns" with his performance. *Id.* ¶ 41.

---

2017) (noting that the same actor inference applies even where a supervisor "was not deeply involved in the hiring process" but "still 'made the decision to hire' [the plaintiff] knowing that he would be working under [the supervisor's] supervision"); *Mulkerin v. Bunch*, No. 1:19-CV-03850, 2021 WL 3771806, at *3 n.5 (D.D.C. Aug. 25, 2021) ("Th[e] so-called 'same actor inference' cuts against inferring discriminatory motives on the part of [two of the plaintiff's future supervisors] given that they both *played a role* in hiring and firing [the plaintiff].") (emphasis added).

10

Cunningham also met with Da'Vage that month to discuss concerns with his performance. *Id.* ¶¶ 48–49. Only after all those conversations and a failed inspection was Da'Vage let go in April 2021. *Id.* ¶ 63. No less than VanHaaren, then, Da'Vage received ample notice that his performance needed to improve.

Perhaps in an attempt to establish that WCS had a "formal system or procedure for employee evaluations" or a "company practice," Response at 18–19, Da'Vage invokes the 2019 WCS Employee Handbook, *id.* at 15. But Da'Vage does not identify anything in the handbook suggesting that he suffered from any deviation from official company policy. The handbook only provides that "[p]erformance review meetings *may* occur as frequently as quarterly check-ins, while a more formal review *should generally* occur on an annual basis." *Id.* (emphasis added). Further, Da'Vage does not claim that any of the other proffered comparators received an Employee Assistance Plan like VanHaaren, so he cannot establish that such plans constituted a "company practice" that was withheld in his case.[4]

*Inconsistent Explanations*. Da'Vage also argues that WCS's explanation is inconsistent because a form created by the D.C. Department of Employment Services listed the reason for his separation as "Laid Off/Lack of Work" rather than poor performance. Response at 24; ECF No. 70-1 at 143. Da'Vage claims that this response contradicts the reasons given to him for his termination. Response at 25. But the form does not evince any inconsistency, let alone pretext. The form—sent to WCS after Da'Vage filed an unemployment insurance claim—required Da'Vage and WCS to list a "Reason for Separation." ECF No. 70-1 at 143. *Both* listed "Laid Off/Lack of Work" in that field, presumably because "Laid Off" was the most accurate description

---

[4] Further, even Da'Vage's Statement of Undisputed Material Facts seems to accept that WCS did not have a formal system for employee performance evaluations or discipline at the relevant time. *See* Davage Statement of Facts at 36–37, ¶¶ 41–44.

available. That Da'Vage himself did not answer "Poor Performance"—which no one disputes was the explanation given to Da'Vage for his termination—suggests that "Laid Off/Lack of Work" was the appropriate response to the questionnaire; at least, Da'Vage offers no reason to believe otherwise. Regardless, Da'Vage's contention that his employer's "contemporaneous report[ing]" about his behavior was "inaccurate" is insufficient "for purposes of summary judgment to cast doubt on the adverse employment record established by the large volume" of Da'Vage's performance issues. *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1100 (D.C. Cir. 2017).

### B.    Aiding and Abetting

In addition to his claims against WCS, Da'Vage also sued Jones and Cunningham for allegedly aiding and abetting their employer's discrimination. *See* D.C. Code § 2-1402.62 (making it unlawful for "any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter"). But liability for aiding and abetting requires a finding of a primary violation. *See McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 156–57 (D.D.C. 2014). Because Da'Vage's primary discrimination claims against WCS fail, the derivative aiding and abetting claims against the employees do as well.[5]

---

[5] Da'Vage's aiding and abetting claims also fail for failure to serve the individual defendants within the time allotted by the Court. *See* Minute Order of October 28, 2024; *Morrissey v. Mayorkas*, 17 F.4th 1150, 1158 (D.C. Cir. 2021); Mot. at 1 n.1 (asserting that Da'Vage's aiding and abetting claims are moot for failure to serve). And, by failing to address WCS's argument that his claims are moot in his response, Da'Vage concedes the point. *See Guevara v. Ischia, Inc.*, 47 F. Supp. 3d 23, 27 (D.D.C. 2014) ("It is well established that if a [party] fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded.").

## IV. Conclusion

Because Da'Vage has failed to produce evidence sufficient to allow a reasonable jury to find that WCS's justification for his termination was pretextual, WCS is entitled to summary judgment. A separate Order will issue contemporaneously.

DATE: February 18, 2026

CARL J. NICHOLS
United States District Judge